2005-NMCA-062

112 P.3d 1134

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Charles MAESTAS, Defendant–Appellant.**

**No. 24507.**

Court of Appeals of New Mexico.

March 28, 2005.

Certiorari Granted, No. 29,178,
May 20, 2005.

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, for Appellee.

David Henderson, Downing & Henderson, P.C., Santa Fe, for Appellant.

## OPINION

FRY, J.

{1} In this appeal we consider whether coercion is an essential element of second

degree criminal sexual penetration perpetrated in the commission of another felony (CSP II (felony)), contrary to NMSA 1978, § 30–9–11(D)(5) (2003). Defendant Charles Maestas, who was an Española municipal judge at the time of the charged events, appeals his convictions of five counts of requesting or receiving sexual favors "conditioned upon or given in exchange for promised performance of an official act" (official acts prohibited), NMSA 1978, § 10–16–3(D) (1993), a fourth degree felony, and five counts of CSP II (felony). The underlying felony for each CSP II conviction was official acts prohibited. We conclude coercion is not an essential element of CSP II (felony). We also find no error in the trial court's evidentiary rulings and affirm Defendant's convictions.

## BACKGROUND

{2} Defendant's convictions arose from allegations that he accepted sexual favors from Victim in exchange for leniency in the resolution of charges against Victim in municipal court. At trial, Defendant's theory was that Victim plotted to seduce Defendant and then falsely claimed that Defendant coerced her into various sex acts so that she could sue Defendant's employer, the City of Espanola, for violation of her civil rights.

{3} In support of his theory, Defendant presented evidence that Victim heard rumors that Defendant was giving preferential treatment to women in the city jail in exchange for sexual favors. Several months later, when Victim had several traffic charges pending before Defendant, Victim hid a tape recorder under her clothing and recorded two sexual encounters with Defendant. There was also evidence that Victim was gleeful when she learned about Defendant's subsequent arrest and said, "We got him."

{4} The State presented evidence supporting a different theory. Victim testified that she first appeared before Defendant in municipal court on several traffic code violations. Victim pleaded guilty, whereupon Defendant told Victim to come with him to his office. Defendant told Victim that she faced possible jail time of seventy to ninety days and about $700 in fines. Victim began crying. When she got up to leave, Defendant took her hand and said, "[M]aybe you could do something for me to take away your fines and you won't go to jail." Victim understood that Defendant was asking her for sex. She initially declined, but she was afraid Defendant would take her children away "because I knew he has the power to take them away because he's a Judge." Victim told Defendant she would have to think about it, and Defendant told Victim to ask the court clerk to set another court date.

{5} Although it is unclear what happened between this first encounter in Defendant's office and the first sexual encounter, at some point following the initial court date, according to Victim, Defendant picked Victim up at her office and took her to his house, where they had sexual intercourse. Because Victim had complied with Defendant's request for sex, she testified, "I figured he would drop everything [and] my kids wouldn't get taken away[.]"

{6} Sometime later, in response to a mailed notice, Victim went back to court, where Defendant talked to Victim (presumably in Defendant's office) about helping her with her fines. She told Defendant she thought her fines were cleared, and Defendant told her they were not. He then asked Victim to do him a favor, closed the door, and asked her to perform oral sex; Victim complied. Defendant then told Victim to make another court date.

{7} Victim testified about two other incidents when Defendant picked her up. On one occasion he took her to his house, and on another, Defendant took Victim in his vehicle to an area near the community college, where he parked. On both occasions Defendant asked Victim for oral sex, and Victim complied. On another occasion, Defendant came to Victim's office and asked for oral sex, which Victim performed in Defendant's truck. While these encounters were taking place, nothing was happening with Victim's court case. She kept appearing in court, but nothing was dropped.

{8} At about this time, Victim heard from a friend that Defendant had done something similar to another woman, so Victim decided to tape-record Defendant. Victim

recorded Defendant once at his office and once at his house.

{9} On the first tape, Defendant and Victim discussed Victim's fines, potential jail time, and suspended driver's license. Defendant told Victim that if she would get her license cleared up, he would assess only $17 in fees on each charge for a total of $68. Defendant then commented on Victim's breasts and lips. He scheduled Victim's next court date and said, "We'll see if we can try and get together before that.... Give me a call when you're ready."

{10} On the second tape, Victim stated that she was at Defendant's house, waiting for him. When Defendant arrived, Victim asked, "Okay what am I going to get out of this? ... Will you lower my fines?" Defendant responded, "Oh yeah." A sex act then ensued, the two said goodbye, and Victim stated on the tape, "I just exchanged ... giving head to the judge to change my[,] to lower my fines."

{11} The audiotapes made by Victim ultimately led to Defendant's arrest. He was charged with six counts each of CSP, extortion, and official acts prohibited, which corresponded with the six sexual encounters Victim reported. Several other women then alleged that they had also performed sexual favors for Defendant in exchange for lenient treatment in court, and these allegations gave rise to additional charges.

{12} At trial, the court instructed the jury on ten counts of sexual misconduct involving three women, nine counts of extortion, eight counts of official acts prohibited, and one count of stalking. The jury acquitted Defendant of all charges pertaining to the women other than Victim. With respect to Victim, the jury convicted Defendant of five counts of official acts prohibited and five counts of CSP II (felony), and it acquitted him of one count of CSP, one count of criminal sexual contact, one count of official acts prohibited, and all counts of extortion. We discuss additional background information in our analysis of the appellate issues.

## DISCUSSION

### Jury Instructions

{13} Defendant argues the jury instructions on the elements of CSP II (felony) were flawed because they did not tell the jury it could only convict Defendant if it found that Defendant coerced Victim into engaging in the various sex acts alleged. Defendant contends that, even if the jury agreed with his view of the evidence—i.e., that Victim enticed Defendant into having sex and that the sex was therefore consensual—the jury instructions nonetheless compelled the jury to convict Defendant.

{14} The issue of whether a given jury instruction is proper presents a mixed question of law and fact, which we review de novo. *State v. Gaitan*, 2002–NMSC–007, ¶ 10, 131 N.M. 758, 42 P.3d 1207; *State v. Salazar*, 1997–NMSC–044, ¶ 49, 123 N.M. 778, 945 P.2d 996. A jury instruction is proper, and nothing more is required, if it fairly and accurately presents the law. *State v. Duncan*, 113 N.M. 637, 644, 830 P.2d 554, 561 (Ct.App.1990). "We review [the] instructions to determine whether a reasonable juror would have been confused or misdirected by the jury instructions." *State v. Montoya*, 2003–NMSC–004, ¶ 23, 133 N.M. 84, 61 P.3d 793; *State v. Benally*, 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.*

{15} We limit our review to the instructions pertaining to Victim because only those instructions gave rise to convictions. The trial court instructed the jury that, with respect to each count of CSP, there were three alternatives, including CSP II (felony), where the underlying felony was official acts prohibited. The jury did not arrive at a verdict on the other alternatives, so we are concerned only with the instruction on CSP II (felony; official acts prohibited), which reads as follows:

For you to find the Defendant guilty of criminal sexual penetration while committing another felony as charged in the alternative to Count [__], the State must prove to your satisfaction beyond a reasonable

doubt each of the following elements of the crime:

1. The Defendant caused [Victim] to engage in [sex act];
2. The Defendant committed the act during the commission of violating official acts prohibited; ...
3. This happened in New Mexico on or about ... [date].

This instruction referred the jury to another instruction that defined official acts prohibited as follows:

1. That the defendant requested or received a thing of value from [Victim];
2. That the thing of value was given in exchange for a promised performance by the Defendant of an official act;
3. This happened in New Mexico on or about ... [date].

■ {16} Defendant argues, and we agree, that CSP II (felony) is a "compound crime" like felony murder. *State v. Tsethlikai*, 109 N.M. 371, 373, 785 P.2d 282, 284 (Ct.App.1989) (stating that a compound crime consists of two crimes, a predicate offense that is a prerequisite and the compound offense itself). Thus, he argues that in order to prove CSP II (felony), the State had to prove the elements of third degree CSP (CSP III) *plus* the elements of the underlying felony. CSP III is statutorily defined as "all criminal sexual penetration perpetrated through the use of force or coercion." § 30–9–11(E). Therefore, Defendant contends the State had to prove CSP perpetrated through force or coercion plus the elements of the underlying felony. Because the concept of force or coercion was not mentioned in either the instruction on the elements of CSP II (felony; official acts prohibited) or the instruction on the elements of official acts prohibited, Defendant maintains the instructions lacked an essential element and resulted in jury confusion and an erroneous conviction.

■ {17} We disagree with the premise underlying Defendant's logic—that proof of the elements of CSP III is necessary in order to prove CSP II (felony). We reach this conclusion through an examination of the governing statute. § 30–9–11.

{18} Section 30–9–11(A) defines the base crime of criminal sexual penetration as "the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission." This definition says nothing about force or coercion; instead, it speaks in terms of "causing" a person to engage in a sex act.

{19} Section 30–9–11(D) then defines second degree CSP, which is at issue here, as follows:

D. Criminal sexual penetration in the second degree consists of all criminal sexual penetration perpetrated:

(1) on a child thirteen to eighteen years of age when the perpetrator is in a position of authority over the child and uses this authority to coerce the child to submit;

(2) on an inmate confined in a correctional facility or jail when the perpetrator is in a position of authority over the inmate;

(3) by the use of force or coercion that results in personal injury to the victim;

(4) by the use of force or coercion when the perpetrator is aided or abetted by one or more persons;

(5) in the commission of any other felony; or

(6) when the perpetrator is armed with a deadly weapon.

{20} We first observe that force or coercion is an express element of only three out of the six alternative grounds for CSP II. Under a guiding principle of statutory construction, it appears that the legislature knew how to require the element of force or coercion and yet chose not to include it when the crime is perpetrated on an inmate, § 30–9–11(D)(2), in the commission of any other felony, § 30–9–11(D)(5), or when the accused is armed with a deadly weapon, § 30–9–11(D)(6). *See State v. Davis*, 2003–NMSC–022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (explaining that in ascertaining legislative intent we start by looking at the words chosen by the legislature). Because the legislature omitted from the definition of CSP II (felony) a re-

quirement for force or coercion, we cannot agree with Defendant that the legislature intended that CSP II (felony) necessarily includes the elements of CSP III, which is defined as all CSP "perpetrated through the use of force or coercion." § 30–9–11(E). This omission of any requirement of force or coercion is even more striking in the context of CSP I (on a child under thirteen years of age). If Defendant is correct in this case, then force or coercion is also required for CSP I, which we are certain the legislature did not intend.

{21} Defendant relies on various New Mexico cases to support his position that force or coercion is an essential element of CSP II (felony). We are not persuaded. It is true that in *State v. Pisio,* 119 N.M. 252, 889 P.2d 860 (Ct.App.1994), we said that "unless there is force or coercion beyond that inherent in almost every CSP, the proper charge is CSP III." *Id.* at 259, 889 P.2d at 867. However, in *Pisio,* we were discussing whether the trial court should have instructed the jury that CSP III was a lesser included offense of CSP II (felony) and that false imprisonment was a lesser included offense of kidnaping under the circumstances of that case. *Id.* at 259–60, 889 P.2d at 867–68. Similarly, in *State v. Corneau,* 109 N.M. 81, 85–87, 781 P.2d 1159, 1163–65 (Ct.App.1989), our discussion of the force used to perform the act of CSP was in the context of determining whether charges of false imprisonment and CSP II (felony; false imprisonment) violated the prohibition against double jeopardy. In neither case were we confronted with the issue presented here. *See Ramirez v. Dawson Prod. Partners, Inc.,* 2000–NMCA–011, ¶ 10, 128 N.M. 601, 995 P.2d 1043 (explaining that "cases are not authority for propositions they do not consider").

{22} Other cases on which Defendant relies are similarly distinguishable. *State v. Lucero,* 118 N.M. 696, 884 P.2d 1175 (Ct.App. 1994), and *State v. Johnson,* 102 N.M. 110, 692 P.2d 35 (Ct.App.1984), *overruled in part on other grounds by Manlove v. Sullivan,* 108 N.M. 471, 775 P.2d 237 (1989), unlike the present case, each involved a conviction for CSP III. *State v. Gillette,* 102 N.M. 695, 699 P.2d 626 (Ct.App.1985), concerned CSP II where the victim was a minor and the perpetrator was in a position of authority and used his authority to coerce the child's submission, charged under what is now Section 30–9–11(D)(1). *Gillette,* 102 N.M. at 698, 702, 699 P.2d at 629, 633. As noted, this form of CSP II requires coercion, while the statutory language defining CSP II (felony) does not.

{23} Defendant next points to the contrast between the elements of the crimes with which he was alternatively charged— CSP II (felony; extortion) and CSP III—and the crime of which he was convicted, CSP II (felony; official acts prohibited). He contends that the instructions for both CSP II (felony; extortion) and CSP III required an element of coercion, while the instructions for CSP II (felony; official acts prohibited) did not. In order to convict Defendant of CSP II (felony; extortion), the jury would have had to find that (1) "Defendant caused [Victim] to engage in [a specified sex act]" committed "during the commission of extortion;" and (2) "Defendant used threats of fines, jail and/or to separate her from her children, intending to wrongfully compel [Victim] to do something she would not have done, to-wit: engage in [the sex act]." In order to return a conviction for CSP III, the jury would have had to find that "Defendant caused [Victim] to engage in [a specified sex act,] . . . used threats of fines, jail and/or to separate her from her children" and that Victim believed Defendant would carry out the threats. Thus, because the instructions for CSP II (felony; extortion) and CSP III contained elements of coercion, and because the instruction for CSP II (felony; official acts prohibited) did not, Defendant argues that, even if the jury believed all of Victim's sexual contact with Defendant was purely consensual, it makes sense that the jury could have acquitted Defendant of CSP II (felony; extortion) and CSP III, and yet also convicted him of CSP II (felony; official acts prohibited). Defendant contends the only logical conclusion is that coercion must also be an essential element of CSP II (felony; official acts prohibited).

{24} We disagree. Defendant overlooks those parts of the CSP II (felony; official acts prohibited) instructions requiring the

jury to find that Defendant *caused* Victim to engage in the various sex acts and that the acts occurred *during* the commission of the underlying felony. The emphasized words constitute a requirement that there be a causal connection between the felony and the sex act. This requirement is enough to insure that an accused will not be convicted for engaging in purely consensual sex.

{25} Our Supreme Court has analyzed the requirement for a causal connection in the analogous context of felony murder. Felony murder consists of "all murder perpetrated: ... in the commission of or attempt to commit any felony[.]" *State v. Harrison,* 90 N.M. 439, 441, 564 P.2d 1321, 1323 (1977), *superseded by rule on other grounds as stated in Tafoya v. Baca,* 103 N.M. 56, 60, 702 P.2d 1001, 1005 (1985). Thus, "there must be a causal relationship between the felony and the homicide[.]" *Id.* In defining what causal relationship is necessary, the Court stated that "causation must be physical; causation consists of those acts of [the] defendant or his accomplice initiating and leading to the homicide without an independent force intervening, even though [the] defendant's or his accomplice's acts are unintentional or accidental." *Id.* at 441–42, 564 P.2d at 1323–24 (footnote omitted).

{26} We hold that force or coercion is not an essential element of CSP II (felony). Through its definitions of CSP II, the legislature intended to punish those who participate in certain sexual activity, even without force or coercion, when the participant is in a position of authority over an inmate, when the participant is armed with a deadly weapon, or when the sex act is caused by the defendant in the commission of any other felony. Although some felonies underlying CSP II (felony) may themselves require force or coercion, not all felonies will require such force or coercion. The legislature did not limit CSP II to only felonies involving force or coercion, but simply required that the CSP be caused by the defendant "in the commission of any other felony." § 30–9–11(D)(5). It is apparent, then, that "any other felony" includes felonies that have no element of force or coercion and, therefore, any felony may serve as the underlying felo-ny for a conviction of CSP II (felony). The legislature has determined as a matter of policy that sex acts occurring in certain specified contexts are more blameworthy than CSP III, and we will not second guess that determination. *See Torres v. State,* 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("[I]t is the particular domain of the legislature, as the voice of the people, to make public policy.").

{27} Defendant's final argument attacking the jury instructions relies on affidavits signed by six jurors after the jury rendered its verdict and had been discharged. The affidavits generally state that the jurors did not vote to convict Defendant of "Criminal Sexual Penetration, rape or extortion for sex." Defendant argues that these affidavits corroborate the jury's acquittal of Defendant on certain other charges and demonstrate the jury's confusion.

{28} We do not agree. First, apart from the affidavits, the record does not indicate that the jury acquitted Defendant of the charges on which he relies. In fact, the record reflects neither acquittal nor conviction on these charges, which were presented to the jury in the instructions and one verdict form as alternatives to the CSP II charge on which Defendant was convicted. Second, it is settled law that jurors may not impeach their verdict by affidavit after they are discharged. *Lamkin v. Garcia,* 106 N.M. 60, 62, 738 P.2d 932, 935 (Ct.App.1987); *see also,* Rule 11–606(B) NMRA (prohibiting a juror from testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions ... or concerning the juror's mental processes in connection therewith, [the verdict]"). The only exception to this rule permits a juror to testify regarding "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.* This exception does not apply in this case.

### Testimony of Witness Lisak

{29} Defendant argues the trial court erroneously permitted Dr. David Lisak to testi-

fy for the State as a rebuttal witness. He argues that Lisak's testimony did not provide "reliable [or] relevant assistance to the jury of any material factual issue." Defendant appears to be contending that Lisak's testimony should have been excluded on the ground that the State failed to establish (1) the reliability of the scientific method relied upon and (2) that the testimony would assist the jury. *See State v. Alberico,* 116 N.M. 156, 166–68, 861 P.2d 192, 202–04 (1993) (explaining that expert testimony should not be admitted unless the expert is qualified, the testimony will assist the trier of fact, and the expert will testify regarding scientific or other specialized knowledge).

■ {30} The State claims Defendant failed to preserve this argument below. However, it is clear from the record that the State and the trial court knew Defendant was making an *Alberico*-type objection, and that the trial court directed the prosecutor to attempt to lay an appropriate foundation. *See State v. Varela,* 1999–NMSC–045, ¶ 26, 128 N.M. 454, 993 P.2d 1280 (explaining that in order to preserve an issue for appeal, the defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling on the objection). We conclude Defendant preserved his objection, and we review the trial court's admission of the evidence for abuse of discretion. *State v. Woodward,* 121 N.M. 1, 4, 908 P.2d 231, 234 (1995).

{31} Outside the presence of the jury, Lisak testified to his qualifications, which Defendant does not challenge. Lisak then testified that the scientific understanding of the impact of trauma on victims comes from forty years of observational study of victims of sexual trauma, domestic violence, or combat trauma. These studies have been published in peer-reviewed journals for decades. In addition, the results of these studies are taught at the university level. He explained that he had been asked to testify regarding how certain characteristics make victims more or less vulnerable to victimization, how victims respond to threats, and how trauma affects memory.

{32} The trial court concluded that Lisak's testimony could be helpful to the jury, and, in the presence of the jury, Lisak testified that the more vulnerable a person is— whether due to financial concerns, lack of educational opportunity, legal troubles, lack of family support, or a history of substance abuse or prior victimization—the more vulnerable that person is to victimization. He also testified that if a perpetrator has more power than the victim, it is easier for the perpetrator to commit an assault, such as a sexual assault, on the victim. In fact, if there is a significant power differential, the perpetrator can communicate a threat with a glance or a gesture. Finally, Lisak testified that studies show that victims of trauma tend to remember the core details of the trauma very clearly, but the peripheral details of the trauma tend to be lost.

■ {33} The trial court did not abuse its discretion in admitting this testimony. Lisak's testimony established that the scientific observation of victims has been going on for decades and that the results of those studies have been peer-reviewed and taught for an equally long period of time. This testimony reasonably supported the reliability of the general conclusions Lisak stated. *See State v. Torres,* 1999–NMSC–010, ¶ 25, 127 N.M. 20, 976 P.2d 20 (explaining that, in considering the reliability of scientific evidence, a trial court should consider whether a theory has been tested, subjected to peer review, subjected to standards, and whether it is generally accepted in the field). In addition, we do not agree with Defendant that these conclusions "were not tethered in a reliable way to [a] factual proposition at issue." Lisak's testimony could have helped the jury to understand why the alleged victims may have agreed to provide sexual favors to Defendant, and consequently, the testimony may have assisted the jury in deciding the ultimate factual question of guilt or innocence.

### Exclusion of Evidence of Prostitution

{34} Defendant claims the trial court violated his right of confrontation and his right to present evidence in his own defense when it excluded evidence that Victim ran a house

of prostitution. In a motion in limine, Defendant stated that he sought to cross-examine Victim on this issue and to ask another witness, Leroy Salazar, whether he had evicted Victim from public housing for running a brothel.

{35} We note at the outset that Defendant cites no case law on the substance of these issues and presents only a cursory argument in support of his contentions. We therefore address Defendant's arguments in similar, summary fashion.

{36} In determining whether the trial court unduly restricted Defendant's right to cross-examine Victim, we undertake de novo review. *State v. Martinez*, 1996–NMCA–109, ¶ 14, 122 N.M. 476, 927 P.2d 31. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. Gonzales*, 1999–NMSC–033, ¶ 22, 128 N.M. 44, 989 P.2d 419 (internal quotation marks and citations omitted). Here, as best we can tell from the record, the trial court excluded any mention of Victim's alleged prostitution because Defendant failed to meet his burden under the so-called rape shield law. *See* NMSA 1978, § 30–9–16(A) (1993) (precluding admission of evidence of a victim's past sexual conduct unless the trial court determines that "the evidence is material to the case and that its inflammatory or prejudicial nature does not outweigh its probative value"). Because defense counsel laid the foundation for admission of this evidence during an in camera hearing that does not appear in the record, we are unable to assess the propriety of the trial court's determination that Defendant failed to meet his burden. We therefore indulge every presumption "in favor of the correctness and regularity of the lower court's judgment." *In re Ernesto M., Jr.*, 1996–NMCA–039, ¶ 19, 121 N.M. 562, 915 P.2d 318.

{37} Similarly, with respect to Defendant's intention to ask witness Salazar on direct about Victim's alleged prostitution, we review the trial court's exclusion of this evidence for abuse of discretion. *Woodward*, 121 N.M. at 4, 908 P.2d at 234. It appears the trial court relied on the same ground for excluding this testimony—Defendant's failure to meet his burden under the rape shield law. In order to present evidence of Victim's alleged prostitution, Defendant had to establish that the evidence was material and that its prejudicial effect did not outweigh its probative value. § 30–9–16(A). While this evidence was certainly relevant to Defendant's theory of the case, which portrayed Victim as the instigator of the sex acts in question, without the benefit of a complete record of the relevant hearing, we cannot say the trial court abused its discretion if it concluded that the evidence's inflammatory nature outweighed its probative value. *See State v. Jim*, 107 N.M. 779, 780, 765 P.2d 195, 196 (Ct.App.1988) ("It is the defendant's burden to bring up a record sufficient for review of the issues he raises on appeal.").

**CONCLUSION**

{38} For the foregoing reasons, we affirm Defendant's convictions.

{39} **IT IS SO ORDERED**.

PICKARD and CASTILLO, JJ., concur.