This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-35694**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**NEIL STAMMER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stan Whitaker, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Lauren J. Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellee

L. Helen Bennett
Albuquerque, NM

for Appellant

### MEMORANDUM OPINION

**VANZI, Judge.**

**{1}**     Defendant Neil Stammer appeals his convictions for two counts of first- degree criminal sexual penetration (CSP) of a child under the age of thirteen and two counts of first-degree kidnapping. Defendant raises three issues: (1) the district court improperly instructed the jury; (2) Defendant's right to a speedy trial was violated; and (3) Defendant's procedural due process rights to appeal were violated. We affirm.

**BACKGROUND**

**{2}** Defendant moved to Albuquerque, New Mexico in the late 1990s and opened a magic and juggling shop on Central Avenue. Defendant had previously opened and managed juggling shops in Washington, D.C. and San Francisco, CA. In about 1998, C.S. (Victim), who was then twelve years old and in the seventh grade at Jefferson Middle School, started "hanging out" at the magic shop. The magic shop was a popular place for kids and Victim would go there a few times a week to pass the time after school. According to Victim, Defendant "was the face of the store and was almost always there." In addition to hanging out at the store with Defendant, Victim would usually walk with Defendant to a juggling club hosted on the UNM campus on Friday afternoons.

**{3}** On April 27, 2000, the grand jury indicted Defendant on several counts relating to his sexual assault of Victim, a child under the age of thirteen. The indictment was a re-filing of charges from an original indictment that was dismissed by the State on July 20, 1999, and a subsequent indictment that was dismissed by the district court on April 12, 2000. The district court sent a notice directing Defendant to appear for arraignment on May 15, 2000. Defendant failed to appear and, on May 16, 2000, the court issued a bench warrant for Defendant's arrest. Defendant left Albuquerque on April 13, 2000 and left the country in 2002 or 2003.

**{4}** The bench warrant was still outstanding in July 2014 when Defendant was located in Nepal by the FBI and U.S. State Department's Bureau of Diplomatic Security. Special agents using photo recognition technology located Defendant, who had entered Nepal using a fraudulent passport and name. He was returned to New Mexico on July 19, 2014, and arraigned six days later.

**{5}** In December 2015, a jury convicted Defendant of two counts of CSP (child under thirteen) and two counts of kidnapping. In addition, the jury was given special verdict forms in which it found beyond a reasonable doubt that Defendant did not voluntarily free Victim in a safe place. The district court sentenced Defendant to fifty-four years imprisonment. We discuss additional facts below as necessary to address Defendant's arguments on appeal.

## DISCUSSION

### The District Court Did Not Improperly Instruct the Jury

**{6}** Defendant argues that the special verdict forms submitted to the jury constructively amended the indictment, thus allowing the jury to find Defendant guilty of first-degree kidnapping when he was only indicted for second-degree kidnapping. Further, he argues that there was insufficient evidence to support the jury's determination that he did not free Victim in safe places. Lastly, Defendant contends that the district court erred in failing to instruct the jury according to *State v. Trujillo*, 2012-NMCA-112, 289 P.3d 238. Specifically, he argues that "there is no evidence that [Defendant] restrained C.S.'s freedom of movement . . . except incidentally to the performance of the sexual acts."

**{7}** "The propriety of jury instructions is a mixed question of law and fact." *State v. Romero*, 2005-NMCA-060, ¶ 8, 137 N.M. 456, 112 P.3d 1113. When, as in this case, "the issue has been preserved[,] we review the instruction for reversible error." *State v. Cabezuela*, 2011-NMSC-041, ¶ 21, 150 N.M. 654, 265 P.3d 705 (alteration, internal quotation marks, and citation omitted). "Reversible error arises if a reasonable juror would have been confused or misdirected." *Id.* ¶ 22 (omission, internal quotation marks, and citation omitted). Further, the standard by which we review a jury verdict for sufficiency of the evidence is well-established. "Evidence is viewed in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted). We then determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (internal quotation marks and citation omitted). "Because an appellate tribunal does not enjoy the same exposure to the evidence and witnesses as the jury at trial, our review for sufficiency of the evidence is deferential to the jury's findings." *Id.*

### 1. The Special Verdict Forms Did Not Constitute an Impermissible Constructive Amendment to the Indictment

**{8}** Defendant first contends that the indictment was constructively amended by the jury instructions because he was convicted of first-degree kidnapping even though the original indictment stated that Victim was freed in a safe place and no great bodily harm was inflicted. Specifically, he argues that the jury instructions so altered the indictment as to charge an offense different from the offense charged by the grand jury and, therefore, an unconstitutional constructive amendment of an indictment occurred warranting reversal.

**{9}** Rule 5-204(C) NMRA provides that "[n]o variance between those allegations of a[n] . . . indictment . . . which state the particulars of the offense, whether amended or not, and the evidence offered in support thereof shall be grounds for the acquittal of the defendant unless such variance *prejudices substantial rights of the* defendant" and that "[t]he court may at any time allow the indictment or information to be amended in respect to any variance to conform to the evidence." (emphasis added). An amendment—even a mid-trial amendment—to the indictment "is not fatal unless the accused cannot reasonably anticipate from the indictment what the nature of the proof against him will be." *State v. Marquez*, 1998-NMCA-010, ¶ 20, 124 N.M. 409, 951 P.2d 1070.

**{10}** In 1999, kidnapping was a second-degree felony unless the State proved that the victim was not freed in a safe place or that great bodily harm was inflicted. NMSA 1978, Section 30-4-1(B) (1995) ("Whoever commits kidnapping is guilty of a first[-]degree felony, except that he is guilty of a second[-]degree felony when he voluntarily frees the

victim in a safe place and does not inflict great bodily harm upon the victim.")[1] Although the indictment in this case stated that Victim was freed in a safe place and no great bodily harm was inflicted, it did not state the degree of kidnapping that was charged, as it did with the other charges.

**{11}**     At the close of trial, and consistent with UJI 14-403 NMRA, the jury was instructed on the kidnapping charges in Counts 3 and 4, in relevant part, as follows:

> For you to find [D]efendant guilty of kidnapping . . . , the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
>    1.     [D]efendant took or restrained or confined or transported [Victim] by force or intimidation or deception;
>
>    2.     [D]efendant intended to hold [Victim] against [Victim's] will to inflict death, physical injury or a sexual offense on [Victim];
>
>    3.     [D]efendant's act was unlawful[.]

The jury was further instructed that if it found Defendant guilty of kidnapping, then it had to determine whether Defendant voluntarily freed Victim in a safe place. Special verdict forms asked if the jury unanimously found "beyond a reasonable doubt that [D]efendant did not voluntarily free [Victim] in a safe place[.]"

**{12}**     During the discussion on the jury instructions, defense counsel argued that "[t]he State should not be allowed to submit the special verdict form to elevate this to first-degree kidnapping" when the grand jury had charged second-degree kidnapping. The district court disagreed stating that the jury was unlikely to make a distinction between first- and second-degree kidnapping, that it was applying the law as it was in 1999, and that this was merely an enhancement in the sentence. Thus, it concluded, "the language in the indictment justifies a special verdict form." In addition, the State noted that the special verdict forms were modified to conform to the evidence at trial, which the district court found was a factual issue to be determined by the jury.

**{13}**     The jury ultimately found that Defendant did not voluntarily free Victim in a safe place and he was thus convicted of two counts of first-degree kidnapping.  Defendant was sentenced to imprisonment for a term of 18 years to run concurrently for each of the two kidnapping convictions as charged in the "Amended Indictment."

**{14}**     Although Defendant contends that the kidnapping instructions and special verdict forms resulted in an impermissible constructive amendment of the indictment, he made no argument below—nor does he make one on appeal—that the instruction given by the district court violated his rights to notice or to adequately prepare a defense. He also

---

1 The 2003 version of Section 30-4-1 provides that kidnapping is a first-degree felony if the defendant does not voluntarily free the victim in a safe place or inflicts a physical injury or sexual offense on the victim.

does not contend that he was unable to reasonably anticipate from the indictment what the nature of proof presented at trial would be or that the kidnapping instructions given did not substantially correspond to the kidnapping charge in the indictment. *See State v. Stevens*, 2014-NMSC-011, ¶ 51, 323 P.3d 901 (noting that a variance did not prejudice the defendant's substantial rights because the conduct underlying the additional charges was the same); *State v. Johnson*, 1986-NMCA-084, ¶ 7, 105 N.M. 63, 728 P.2d 473 (stating that "[a] variance is not fatal unless the accused cannot reasonably anticipate from the indictment what the nature of the proof against him will be"). Finally, Defendant makes no argument that he suffered any prejudice by the variance warranting reversal in this case. *See Marquez*, 1998-NMCA-010, ¶ 20 (stating that "[t]he mere assertion of prejudice, without more, is insufficient to establish prejudicial error warranting reversal of a conviction." (internal quotation marks and citation omitted)).

**{15}** We conclude that there is no evidence that any variance prejudiced Defendant's substantial rights. Accordingly, there is no basis to reverse the sentence enhancements for the kidnapping charges in this case.

**2.  Sufficient Evidence Supported the Jury's Determination That Defendant Did Not Free Victim in a Safe Place**

**{16}** Defendant next argues that there was no evidence to support the jury's finding that Victim was not freed in a safe place. According to Defendant, the evidence established that after the first incident, Defendant and Victim walked from the apartment to the shop and participated in juggling activities, after which Victim went home. After the second incident, Victim "was released to the care of his father who had come to pick him up from the shop." Defendant argues that this evidence did not support the jury's finding that Victim was not freed in a safe place following either incident. We are not persuaded.

**{17}** As an initial matter, Defendant does not fully describe the evidence presented at trial. As to the first incident, Victim testified that Defendant asked Victim to accompany him to his house to get some toys for Defendant's magic shop. While at Defendant's apartment, Defendant gave Victim, who was twelve years old at the time, oral sex. Afterward, and by which point it had become dark outside, Defendant walked with Victim to the juggling club on the UNM campus. With regard to the second incident, Defendant asked Victim to stay at the shop to practice a routine for an upcoming event, and called Victim's parents to ask if he could stay an extra hour. After the phone call, Defendant took Victim into the back room where he performed oral sex on Victim and had Victim place his hand over Defendant's penis. Because his parents did not feel it was safe for Victim to walk home alone in the dark, Victim's father came to pick him up twenty minutes after the incident.

**{18}** To constitute voluntary release in a safe place, the jury had to determine beyond a reasonable doubt either (1) that Defendant did not voluntarily free Victim; or (2) if Defendant voluntarily freed Victim, that Victim was not freed in a safe place. *State v. Laguna*, 1999-NMCA-152, ¶ 28, 128 N.M. 345, 992 P.2d 896. Thus, Defendant had to

release Victim in a place and manner which realistically conveyed to Victim that he was free to leave and in circumstances and surroundings where he could get assistance. In support of his argument, Defendant cites to evidence that he voluntarily released Victim in a safe place after each incident—either to go home or to the care of his father. Contrary to Defendant's assertions, we conclude that, based on the testimony in this case, sufficient evidence existed to support the jury's determination that Defendant did not voluntarily free Victim in a safe place. Defendant points to no evidence that he voluntarily released Victim after either of the offenses. It was dark outside both times he released Victim and with the second incident unlocked the door to the magic shop only after Victim's father arrived to pick him up. We conclude there was sufficient evidence that Defendant's release of Victim was not voluntary and/or in a safe place.

### 3. The District Court Did Not Err in Failing to Instruct the Jury According to *Trujillo*

**{19}** Defendant argues that the district court erred by failing to instruct the jury pursuant to *Trujillo*, 2012-NMCA-112, on the basis that there was no evidence Defendant restrained Victim's freedom of movement "except incidentally to the performance of the sexual acts." *Trujillo* and the jury instruction that followed it do not support Defendant's argument. We explain.

**{20}** In *Trujillo*, this Court held that the restraint—a momentary grab in the middle of a fight—was not conduct that was contemplated by the kidnapping statute because it was "merely incidental" to the battery. *Id.* at ¶¶ 6, 8. As we reiterated that "appellate courts have consistently held that the evidence of force used in kidnapping must be independent of the evidence of force used in CSP." *Id.* at ¶ 11. After *Trujillo*—and after Defendant's trial—the jury instruction for kidnapping was amended to require the jury to find that the "taking or restraint . . . of [the victim] was not slight, inconsequential, or merely incidental to the commission of another crime." UJI 14-403 (2015). Use Note 8 of UJI 14-403 requires that the instruction be given only "if the evidence raises a genuine issue of incidental conduct[.]"

**{21}** Unlike *Trujillo*, the restraints in this case were not momentary but were longer or greater than necessary to commit the CSPs. With respect to the first incident, Victim reluctantly accompanied Defendant to his apartment, which was located about a half a mile from the shop to pick up juggling toys for the store. Once there, Defendant invited Victim inside the apartment and took him upstairs. He had Victim sit on the bed and put music on for Victim while he used the restroom to shave. As to the second incident, Victim told Defendant that he did not want to stay late, but Defendant called Victim's parents for permission to ask if Victim could stay an extra hour. Victim remained in the magic shop for about twenty minutes after the CSP until his father arrived to pick him up. On these facts, we conclude that the restraint required for the kidnapping as to both incidents was not "merely incidental" to the CSP that occurred. Indeed, significant time passed before and after the CSPs that qualified as restraint in both circumstances. The district court did not err in failing to give the jury instruction on incidental conduct.

**Defendant's Right to a Speedy Trial Was Not Violated**

**{22}** "The right of the accused to a speedy trial is guaranteed by both the Sixth Amendment of the United States Constitution and Article II, Section 14 of the New Mexico Constitution." *State v. Spearman*, 2012-NMSC-023, ¶ 16, 283 P.3d 272. A determination of whether the right has been violated is made on a case-by-case basis, looking to the particular circumstances of each case. *Id.* ¶ 16. In determining whether a defendant has been deprived of the right to a speedy trial, "we consider the four factors articulated in *Barker*: (1) the length of delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant caused by the delay." *State v. Serros*, 2016-NMSC-008, ¶ 5, 366 P.3d 1121. "We defer to the district court's factual findings in considering a speedy trial claim, but weigh each factor de novo." *State v. Ochoa*, 2017-NMSC-031, ¶ 4, 406 P.3d 505.

**1.     Length of Delay**

**{23}** We first determine whether the length of the delay is presumptively prejudicial. "The first factor, the length of delay, has a dual function: it acts as a triggering mechanism for considering the four *Barker* factors if the delay crosses the threshold of being presumptively prejudicial, and it is an independent factor to consider in evaluating whether a speedy trial violation has occurred." *Serros*, 2016-NMSC-008, ¶ 22. Our Supreme Court has established benchmarks for presumptively prejudicial delay according to the complexity of a case: twelve months for a simple case, fifteen months for a case of intermediate complexity, and eighteen months for a complex case. *See State v. Garza*, 2009-NMSC-038, ¶¶ 47-48, 146 N.M. 499, 212 P.3d 387. The weight we assign this factor varies with the length of the delay—"[a]s the delay lengthens, it weighs increasingly in favor of the accused." *Ochoa*, 2017-NMSC-031, ¶ 14.

**{24}** Defendant's speedy trial right attached on May 15, 1999, when Defendant was arrested. The parties and the district court below agreed that given the number of witnesses and the nature and number of charges that this was a complex case, and we defer to the district court's finding in this regard on appeal. *See id.* ¶ 15 (noting that the appellate courts defer to the district court's findings of complexity when the finding is supported in the record). Accordingly, the presumptive period for this "complex" case to be brought to trial is eighteen months. *See Garza*, 2009-NMSC-038, ¶ 2.

**{25}** The district court found that, in terms of the weight given to the length of delay, "based on the passage of an additional [fifteen] years beyond the triggering date, the length of delay weighs heavily against the State." The State contends that the excessive delay in this case of over sixteen years between the time of Defendant's arrest in 1999 and his trial in 2015 was caused nearly entirely by Defendant's flight out of the jurisdiction and, therefore, only the twenty-nine-month period prior to his flight and after his return should be considered in determining how to weigh the length of delay. According to the State, the sixteen-year delay should weigh slightly against the State. We disagree.

**{26}** In *Serros*, our Supreme Court clarified "that the parties' fault in causing the delay is irrelevant to the analysis of the first *Barker* factor." 2016-NMSC-008, ¶ 26. The Court explained that "[t]he length of delay is an objective determination that is capable of measurement with some precision, and once established, it colors the rest of the speedy trial analysis. A delay that crosses the threshold for presumptive prejudice necessarily weighs in favor of the accused[.]" *Id.* As the Court noted, "[t]he remaining *Barker* factors leave ample room to consider whether the other circumstances in the case, including the fault of [Defendant], outweigh the length of delay." *Id.* ¶27. Accordingly, we do not disturb the district court's finding in this regard and proceed to look to the other factors to determine whether they ultimately favor the "societal interest in bringing [Defendant] to trial." *Garza*, 2009-NMSC-038, ¶ 12.

## 2. Reasons for Delay

**{27}** The second *Barker* factor evaluates the reasons for each period of delay and assigns responsibility for each period accordingly. *See Garza*, 2009-NMSC-038, ¶ 25. "Our courts have recognized three types of delay that may be attributable to the state and one type attributable to the defense." *State v. Brown*, 2017-NMCA-046, ¶ 18, 396 P.3d 171. First, intentional delay, which is "a deliberate attempt to delay prosecution of the case in order to hamper the defense." *Id.* Intentional delay weighs heavily against the state. *See id.* The second type of delay is negligent or administrative, which also weighs against the state because "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun[,]" but it does so more lightly than intentional delay. *Id.* (internal quotation marks and citation omitted). "[A]s the length of the delay increases, this type of delay begins to weigh more heavily against the state." *Id.* Third is delay caused by valid reasons, which "are neutral and do not weigh against the state." *Id.* Finally, any delay caused by the defendant generally weighs against the defendant. *See id.*

**{28}** We identify five periods of pretrial delay in this case: (1) from May 14, 1999 to May 15, 2000; (2) from May 16, 2000 to July 19, 2014; (3) from July 20, 2014 to October 16, 2014; (4) from October 16, 2014 to January 22, 2015; and (5) from January 23, 2015 to December 7, 2015. We address each time period in turn.

## May 14, 1999 to May 15, 2000

**{29}** During the first time period, from Defendant's arrest on May 14, 1999, until January 4, 2000, the case appeared to be moving with customary promptness. Defendant was initially indicted on July 12, 1999, and although the State filed a nolle prosequi on July 20, 1999, the case was immediately re-indicted, and nothing in the record indicates the progress of the case was delayed. The parties do not dispute the district court's findings that counsel for Defendant and the State entered their appearances, exchanged discovery, that Defendant moved to dismiss the second indictment pursuant to *State v. Ulibarri*, 1999-NMCA-142, 128 N.M. 546, 994 P.2d 1164, *aff'd* 2000-NMSC-007, 128 N.M. 686, 997 P.2d 818, as being procedurally invalid, and that our Supreme Court directed a hearing scheduled for January 4, 2000 on the matter

be vacated pending the outcome of the Court's decision. The Supreme Court decision in *Ulibarri*, 2000-NMSC-007, affirmed the Court of Appeals and was remanded back to the Second Judicial District Court on March 10, 2000, and a hearing on Defendant's motion to dismiss was subsequently set for April 12, 2000.

**{30}**    Pursuant to the *Ulibarri* decision, on April 12, 2000, the State filed an order of dismissal without prejudice and informed Defendant at the hearing of its intention to proceed to grand jury on April 26, 2000. During this period, there were no charges pending against Defendant. On April 26, 2000, Defendant was indicted again and his arraignment scheduled for May 15, 2000; however, Defendant failed to appear and his whereabouts remained unknown for the next fourteen years.

**{31}**    We agree with the district court that the period from May 14, 1999, when Defendant was arrested until January 4, 2000, when the court was scheduled to hear Defendant's motion to dismiss the indictment appeared to be moving with customary promptness and, therefore, the period of delay of approximately eight months is not held against either party. We further agree with the district court that the Supreme Court's order on December 23, 1999, directing the district court to vacate the January 4, 2000 hearing on the motion to dismiss and which was heard on April 12, 2000, "was not the result of negligence or congested dockets and should be treated as valid and justifiable delay." Finally, we agree that the time from April 12, 2000 to April 27, 2000, should not be included in the speedy trial analysis as there were no charges pending against Defendant during that period. In sum, this first period is not held against either party.

**{32}**    Defendant's sole contention is that the delay from his arrest to his scheduled arraignment "was attributable solely to the State's failure to secure a legally valid indictment until April 27, 2000." To the extent we understand Defendant to claim this period should be weighed against the State, he provides no explanation supporting this claim, nor does he cite any authority in support. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (stating that appellate courts are under no obligation to review unclear or undeveloped arguments); *State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts will not consider an issue if no authority is cited in support of the issue and that, given no cited authority, we assume no such authority exists.").

## May 16, 2000 to July 19, 2014

**{33}**    The delay from April 27, 2000 until July 19, 2014, was the result of Defendant's failure to appear at the May 15, 2000 arraignment. The district court issued a bench warrant for Defendant's arrest and the warrant remained outstanding until Defendant was located in Nepal in 2014 and returned to the United States where he was arrested by the Albuquerque Police Department on July 19, 2014. The district court rejected Defendant's argument that this period of delay was attributable to the State because the State failed to take reasonable efforts to locate him during the fourteen-year span and concluded instead that the period would not be held against the State. For the reasons that follow, we agree with the district court.

**{34}** The district court relied on decisions from New Mexico and other courts holding that the government will not be held responsible for periods of delay in which the defendant is out of the jurisdiction, and the government is unaware of the defendant's whereabouts, or the defendant is avoiding detection. *See e.g., State v. Maddox*, 2008-NMSC-062, ¶¶ 15-16, 145 N.M. 242, 195 P.3d 1254 (declining to weigh against the state time where the defendant was incarcerated in another jurisdiction), *abrogated on other grounds as recognized by Spearman*, 2012-NMSC-023, ¶ 19; *State v. Palacio*, 2009-NMCA-074, ¶ 15, 146 N.M. 594, 212 P.3d 1148 (stating that "[t]he State is not responsible for periods of delay in which a defendant is outside of the jurisdiction and it is unaware of his or her whereabouts"); *see also United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008) (holding that "[i]f a defendant attempts to avoid detection, the government is not required to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension" (internal quotation marks and citation omitted)). The district court found that that, based on Defendant's testimony, Defendant left New Mexico without his passport, travelled under a different name and date of birth, broke off contact with everyone he had known prior to his arrest, did not leave any information on where he was going or how to get into contact with him, and never intended to return to New Mexico. In sum, Defendant "was clearly trying to avoid being found." On these facts, the district court concluded that the State was not negligent in failing to locate Defendant and the period of approximately fourteen years would not be held against it.

**{35}** Defendant argues, as he did below, that the period between May 2000 and July 2014 should be weighed against the State and relies on *Doggett v. United States*, 505 U.S. 647 (1992) and *United States v. Shell*, 974 F.2d 1035 (9th Cir. 1992) in support of his contention. However, both *Doggett* and *Shell* are factually distinguishable from this case.

**{36}** In *Doggett*, the defendant was indicted on federal drug charges, but left the country before he was arrested. *Id.* 648-49. The Drug Enforcement Agency (DEA) notified all United States Customs stations and other law enforcement organizations of the defendant's outstanding arrest warrant, and entered the defendant's name in various databases as well. *Id.* at 649. About a year and a half later, the DEA learned that the defendant was arrested in Panama; however, it never made a formal extradition request. *Id.* The defendant was eventually arrested eight and a half years after his indictment when the U.S. Marshall's Service ran a credit check on outstanding arrest warrants and found that the defendant had been living in the United States openly under his own name for six years. *Id.* at 650. The defendant argued that his right to a speedy trial was violated and the United States Supreme Court agreed. *Id.* at 652. The Court stated that "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that [the defendant] was living abroad, and had they done so, they could have found him within minutes." *Id.* at 652-53. Thus, the Court said, the defendant "would have faced trial [six] years earlier than he did but for the Government's inexcusable oversights." *Id.* at 657.

**{37}** Similarly, in *Shell*, the defendant fled the country after being indicted on a charge of falsifying a passport. 974 F.2d at 1035-36. The government misplaced the

defendant's file and, for six years, made no attempt to locate him. *Id.* at 1036. Applying the principles set forth in *Doggett*, the Ninth Circuit held that the six-year delay was attributable solely to the government's negligence and therefore violated the defendant's right to a speedy trial. *Id.* at 1036.

**{38}** The facts in *Doggett* and *Shell* are markedly different from those in this case. Unlike *Doggett* where the defendant lived openly under his own name for a period of years and could have been located earlier if the government made any effort to track him down, and unlike *Shell* where the government misplaced the defendant's file and made no attempt to locate him, here, Defendant was clearly trying to avoid being found. In addition to the facts found by the district court as set forth above, we note that when Defendant failed to appear for his arraignment, an arrest warrant was immediately issued for his arrest. Shortly thereafter, the State contacted the United States Attorney and the United States Marshals' Service seeking assistance in locating Defendant. This case was featured a number of times on America's Most Wanted during the period Defendant was a fugitive from New Mexico, and he was not located until a novel facial recognition technology was being tested by the FBI in Nepal. We agree with the district court that "[i]n this case evidence of the negligence and carelessness of the State, displayed in *Doggett* and *Shell*, is absent." Accordingly, this period of about fourteen years will not be held against the State.

## July 20, 2014 to October 16, 2014

**{39}** Defendant argues that the period of July 20, 2014 to January 22, 2015, should "weigh against the [S]tate" because "no hearing was held in the matter until January 22, 2015." We are unpersuaded and first address the period from the time of Defendant's return to New Mexico on July 19, 2014, to October 16, 2014. While Defendant is correct that there were no court hearings during this period, the case was nevertheless moving along with customary promptness. Defendant was arraigned, the parties entered appearances, Defendant made demands for discovery, exculpatory information and a speedy trial, the State filed a demand for notice of intention to claim alibi and/or entrapment, a request for disclosure, and a notice of intent to call witnesses. Accordingly, we agree with the district court that during this three-month period when the parties were exchanging information and discovery, the case was moving with customary promptness and does not weigh against either party.

## October 16, 2014 to January 22, 2015

**{40}** During this period the district court entered a stipulated order for the protection of the privacy of child victims and witnesses, and a notice of scheduling conference for January 22, 2015. In addition, the public defender entered a notice of substitution of counsel on October 29, 2014. Additionally, and although not a matter of record, neither party challenges the district court's finding that "[a]t the October 16, 2014, pre-trial conference, it was determined that a trial date would not be set in anticipation of the new rule, LR2-400.[2] It was not until the January 22, 2015, scheduling conference that

---

2 Rule LR2-400 was amended and recompiled at Rule LR2-308 NMRA.

the trial date was set." We agree with the district court that "[t]his delay in setting a trial date was due to the administrative delay of LR2-400 and, therefore, this period of approximately three months weighs slightly against the State." *See Garza*, 2009-NMSC-038, ¶ 25 (holding that administrative delay weighs slightly against the state).

**January 23, 2015 to December 7, 2015**

**{41}** On January 22, 2015, the parties stipulated that this was a "complex" case for purposes of LR2-400 and the case was set for trial to commence on December 14, 2015. Defendant provides no argument but simply agrees with the district court's determination that "this period should also be deemed administrative delay and weighed against the [S]tate, if only slightly." The State, however, disputes the district court's finding and argues that this period of delay was neutral and should not be weighed against either party. In support, the State notes that, during this time, it filed its certification of readiness that it would be ready for trial within the limitation period in LR2-400, there were customary filings and motions, witness statements were still being taken, and there is no record that Defendant objected to the December 2015 trial date at the scheduling conference or on appeal. We agree with the State that this period should be weighed neutrally. Neither the district court nor Defendant has identified any period of delay in which Defendant's case was protracted or that it languished with no activity. Nor was there argument or any evidence presented that the delay was caused by "overcrowded courts, congested dockets or the unavailability of judges, or an understaffed prosecutor's office." *See Garza*, 2009-NMSC-038, ¶ 29 (holding such delay to weigh slightly against the state (citations omitted)). Accordingly, we conclude that this period of delay was neutral and should not be weighed against either party.

**CONCLUSION**

**{42}** In sum, the total delay in this case from the date of Defendant's arrest on May 15, 1999 to his trial date on December 14, 2015 was a little over sixteen and a half years. As the district court noted, even if we disregard the fourteen years where Defendant's whereabouts were unknown, the delay amounts to almost thirty months, or eleven months beyond the presumptively prejudicial eighteen months for complex cases. Of this time, all but three months of the delay was caused by justified or neutral reasons. And those three months—October 16, 2014 to January 22, 2015—weighed only slightly against the State. The district court found that any delay against the State "was due neither to the State's indifference, negligence, or bad faith, and some of the time held against the State appears to have been the result of necessary trial preparation." We likewise conclude that there was no evidence of intentional delay and therefore, on balance, the reason-for delay factor does not weigh against the State.

**1.    Assertion of the Right**

**{43}** The third *Barker* factor analyzes the degree to which the defendant has asserted his right to a speedy trial. *See Garza*, 2009-NMSC-038, ¶ 32. "Under this factor we accord weight to the frequency and force of the defendant's objections to the delay and

analyze the defendant's actions with regard to the delay." *State v. Samora*, 2016-NMSC-031, ¶ 19, 387 P.3d 230 (alteration, internal quotation marks, and citation omitted). "[T]he timeliness and vigor with which the right is asserted may be considered as an indication of whether a defendant was denied needed access to speedy trial over his objection[.]" *Garza*, 2009-NMSC-038, ¶ 32.

**{44}** Defendant's unrebutted testimony was that after the grand jury was cancelled on April 6, 2000, he did not get further notice of any grand jury proceedings and, in fact, "didn't think [the State] was going to go forward with the case." Because Defendant was unaware of the indictment prior to July 2014, this factor weighs neutrally. *See Doggett*, 505 U.S. at 653-54 (noting that because nothing in the record suggested that the defendant knew of his indictment before he was arrested, he was "not to be taxed for invoking his speedy trial right only after his arrest") Defendant here made two separate demands for a speedy trial after he was arrested. On July 31, 2014, defense counsel included a pro forma assertion of Defendant's right to a speedy trial with counsel's entry of appearance. Defendant filed a motion to dismiss on July 14, 2015, which was about a year after he was arrested and five months before trial. Pro forma assertions and motions to dismiss are not given great weight; however, they are sufficient to weigh in Defendant's favor, if only slightly. *See Ochoa*, 2017-NMSC-031, ¶ 42 (stating that "[p]ro forma assertions are sufficient to assert the right, but are given little weight in a defendant's favor"); *State v. Tortolito*, 1997-NMCA-128, ¶ 17, 124 N.M. 368, 950 P.2d 811 (recognizing that a defendant's late assertion of the right to a speedy trial does not weigh significantly in the defendant's favor). We discern no reason to disagree with the district court's conclusion that "[g]iven the timing of Defendant's assertions and that his demands were neither forceful nor frequent[,] this factor weighs only slightly in Defendant's favor."

## 2. Prejudice

**{45}** The final *Barker* factor requires us to look at the prejudice suffered by the defendant as a result of the delay. *See Ochoa*, 2017-NMSC-031, ¶ 48. This analysis focuses on three main interests sought to be protected by the speedy trial right: (1) "preventing oppressive pretrial incarceration," (2) "minimizing anxiety and concern of the accused," and (3) "limiting the possibility that the defense will be impaired." *Id.* Generally, it is a defendant's burden to "make a particularized showing of prejudice to demonstrate a violation of any of the three interests[,]" *Samora*, 2016-NMSC-031, ¶ 21, but "this burden varies with the length of pretrial incarceration." *Ochoa*, 2017-NMSC-031, ¶ 52.

**{46}** Defendant contends that the prejudice factor should be weighed in his favor and against the State. He alleges the following evidence established that the alleged prejudice occurred as a result of the delay in trial: Defendant was in state custody on a no bond hold for eighteen months prior to his December 2015 trial; he suffered anxiety and concern as a result of previously received death threats; his home and workplace were vandalized, and he lost business due to the charges against him; and, his defense

anticipated it would be hampered by the fading memories and deceased witnesses. We are not persuaded by Defendant's argument.

**{47}** In evaluating the prejudice to Defendant, we consider whether Defendant "offered some actual evidence in the form of affidavits, testimony, or documentation in support of the allegations" of prejudice of pretrial incarceration, undue anxiety and concern, or impairment to the defense, which was caused by the delay in bringing the case to trial. *Spearman*, 2012-NMSC-023, ¶ 39. He did not. On appeal, Defendant does not assert that his pretrial incarceration was oppressive or undue but merely cites his brief below stating that he "has been in the custody of the State of New Mexico on a no bond hold." Given that Defendant does not allege how his pretrial incarceration was undue and beyond what anyone incarcerated would suffer, we conclude that he has failed to show particularized prejudice arising from his pretrial incarceration.

**{48}** To the extent Defendant argues that he suffered undue anxiety and concern resulting from events that occurred when the charges were first brought in the late 1990s, those alleged death threats and loss of business occurred shortly after his initial arrest and were not caused by the delay. *See State v. Montoya*, 2015-NMCA-056, ¶ 30, 348 P.3d 1057 (noting that any prejudice suffered by the defendant with respect to employment occurred during the first six months after his indictment and was not caused by the delay; therefore, it did not factor into the prejudice analysis). Defendant does not allege prejudice during the time he was unaware of the pending charges, nor does he contend that he suffered anxiety or concern after returning to New Mexico. Therefore, Defendant has failed to establish undue anxiety and concern.

**{49}** Finally, Defendant argues that his defense has been impaired by the delay because witness memories have diminished and some witnesses have been lost or died. He also contends that he has suffered memory loss and, as a result, cannot remember the names of potential defense witnesses while other potential witnesses could not be located. The district court found that Defendant failed to establish what testimony of the witnesses would have provided and how such testimony would have been material to his case. Further, the court found that Defendant failed to establish any attempts he made to locate any of the allegedly missing witnesses, and failed to establish the loss of any witnesses occurred as a result of the delay. We defer to the district court's findings and therefore agree with the district court's conclusion that Defendant has failed to establish undue prejudice for this factor to weigh in his favor.

### 3. Balancing the *Barker* Factors

**{50}** While the length of delay weighs heavily in Defendant's favor, the prejudice factor weighs only slightly in Defendant's favor. Additionally, neither the reasons for delay nor the assertion of the right nor the prejudice to Defendant weigh in Defendant's favor. On balance, we conclude that Defendant's right to a speedy trial was not violated. *See Samora*, 2016-NMSC-031, ¶¶ 22-23 (concluding that the defendant's speedy trial rights were not violated where the sixty-two month delay and reasons for delay weighed in the defendant's favor, but the assertion of the right factor did not, and the defendant failed

to demonstrate any particularized prejudice); *Garza*, 2009-NMSC-038, ¶¶ 24, 30, 34, 40, (holding that the defendant's speedy trial rights were not violated when the first three factors weighed in his favor to some degree, but he failed to put on evidence of particularized prejudice).

**Defendant's Due Process Rights to a Speedy Appeal Were Not Violated**

**{51}** Lastly, Defendant argues that his procedural due process rights to a speedy trial were violated because the court reporter below failed to comply with this Court's October 24, 2018 order and did not file overdue transcripts. As a result, the total period from the filing of the notice of appeal on June 20, 2016, to the filing of the brief in chief was approximately 1008 days, or just over two and a half years. Defendant contends that "an appeal proceeding normally according to the rules can generally be expected to conclude within one and half to two years" and because this case "languished on this Court's docket for two years" before briefing could begin, a due process analysis should be taken.

**{52}** As Defendant acknowledges, the United States Constitution does not require states to provide convicted defendants with a right to appellate review. *See Harris v. Champion*, 15 F.3d 1538, 1558 (10th Cir. 1994). Nevertheless, both Defendant and the State agree that some federal and state courts recognize a right to a speedy appeal. *See, e.g., id.* at 1557; *Simmons v. Beyer*, 44 F.3d 1160, 1169 (3d Cir. 1995 (stating that the due process guarantees a reasonably speedy appeal if the state has chosen to give defendants the right to appeal); *People v. Whittiker*, 181 P.3d 264, 270 (Colo. App. 2006) ("Excessive delay in the resolution of an appeal can give rise to a cognizable due process claim.").

**{53}** Notwithstanding the decisions from these other jurisdictions, no New Mexico appellate court has yet recognized a right to a speedy appeal. Nor do we need to reach this issue today. Although the court reporter wholly failed in her responsibility to timely prepare and file the transcript of proceedings, the delay in this case was not so excessive as to raise a due process violation. More importantly, Defendant has not alleged any prejudice he suffered as a result of the delay. In sum, Defendant has not provided any argument that his appellate review was hampered in any way nor does he claim that he was unable to fully present any issue on appeal. We therefore decline to review Defendant's speedy appeal argument further.

**CONCLUSION**

**{54}** We affirm.

**{55}** **IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**BRIANA H. ZAMORA, Judge**